## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**MARIAN HAMPRECHT**
**Petitioner,**

**vs.**                                        **CIVIL ACTION:  2:12-cv-00125-UA-DNF**

**STEPHANIE HAMPRECHT**
**Respondent.**

_____/

## PETITIONER MARIAN HAMPRECHT'S BENCH BRIEF IN SUPPORT OF HIS VERIFIED PETITION FOR RETURN

## I.    INTRODUCTION

Petitioner Marian Hamprecht brings this case to secure the return of his six year old son, F.H., to Germany pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA").[1]

The evidence Petitioner will present at the May 4, 2012 hearing will show that F.H.'s habitual place of residence is Germany and that F.H. should be returned to Germany where a German court can resolve, under German law, how Petitioner and Respondent should exercise custody over F.H.  Indeed, Respondent's own admissions conclusively establish that Petitioner, Respondent, and their three children always intended to return to Germany.  Specifically, in an affidavit dated January 3, 2012, submitted by Respondent in support of her application for a student visa, Respondent stated, under penalty of perjury, that:

> I have applied to and been accepted into the Early Childhood Education Associate's Degree Program at Edison Community College.  After termination of the program, *I plan on moving back to my residence in Germany, where I have a strong support circle*

---

[1] The Hague Convention was ratified by the United States on July 1, 1988 and Germany on December 1, 1990.  *See* http://www.hcch.net/index_en.php?act=conventions.status&cid=24 (identifying states that have ratified the Hague Convention) (last visited April 27, 2012).

> *made up of many friends and a large family and where I have strong financial standing.*
>
> \*       \*       \*
>
> I own property in Dorsten, Germany, *where I plan to return and seek employment* upon the termination of my program at Edison Community College.

(*See* Affidavit of Stephanie Hamprecht dated January 3, 2012, a copy of which is attached as Exhibit "A.")  Based on these admissions, Respondent cannot maintain that she or anyone else in her family ever possessed the intent to reside permanently in the United States or that the United States is F.H.'s place of habitual residence.   To the contrary, F.H.'s habitual residence is Germany – the place to which Petitioner and Respondent always intended to return to.

Petitioner, Respondent, and their three children, including F.H. are all German citizens. When Petitioner, Respondent and their three children, including F.H., first traveled to the United States, they did so in connection with their two older children's student visas, which were valid for six months (or 180 days).  The purpose of this trip was for Petitioner's and Respondent's children to be exposed to and learn English.  During the course of this trip, Petitioner's employer decided to establish a subsidiary in the United States and Petitioner was tasked by his employer to get that subsidiary up and running.  In connection with this assignment, Petitioner entered into a contract with his employer pursuant to which he would remain on assignment in the United States until November 30, 2011 at which time it was expected that Petitioner and his family would return home to Germany.

Based on the limited duration of Petitioner's work contract, it was always intended that once Petitioner's job responsibilities in Germany ended, Petitioner, Respondent, and their children, including F.H., would return to Germany.  As such, Petitioner and his family continued to maintain, among other things, residences, cars, insurance, and bank accounts in Germany.

And, none of them ever applied for U.S. Citizenship.  To the contrary, Petitioner and his family lived in the United States pursuant to temporary work visas that expired when Petitioner relinquished his visa and returned to Germany with his two oldest sons in mid-November 2011. Although Petitioner's work assignment was to run until November 30, 2011, he accelerated his return to Germany by two weeks because, as previously briefed, Petitioner's life was threatened while he was in the United States and he feared for his safety and the safety of his two oldest children who were living with him at the time.

Respondent only seeks to remain in the United States with F.H. because she began and continues to have an extramarital affair with an American and views F.H. as a valuable pawn in her divorce action against Petitioner.  However, Respondent's affair does not alter the fact that she and Petitioner always intended that they would return to Germany with their children. Indeed, despite her claim that she intends to permanently reside in the United States, Respondent still has not applied for U.S. citizenship.  Instead, she remains in this country only by virtue of a student visa she applied for after Petitioner returned to Germany.  However, this visa is also temporary and remains valid only for so long as Respondent, who does not work and has no independent source of income, can pay for and attend classes on a full time basis.  Should Respondent be unable to continue to do so, her student visa will expire and she and F.H. may be subject to deportation back to Germany.  Moreover, as stated above, Respondent admits in the affidavit she submitted to United States Citizenship and Immigration Services ("USCIS") in support her application for a student visa that, after she earns her college degree, she intends to *leave the United States*, presumably with F.H., and return to Germany.

Thus, because Petitioner will establish (1) that Germany is F.H.'s habitual place of residence, (2) that Petitioner possesses custody rights over F.H., and (3) that Respondent's

3

wrongful retention of F.H. in the United States breached Petitioner's custody rights, the Court should grant the relief Petitioner seeks and enter an order requiring F.H. to be returned to Germany.

## II.   FACTS

Petitioner, Respondent, and F.H. are German citizens and Germany is where F.H. was born and his habitual place of residence.  (Verified Petition for Return ¶ 3; Marian Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 25:9-10, 25:21-26:4, 66:22-6 and Exhs. 2, 6, a copy of which is attached hereto as Exhibit "B.").[2]  In February of 2009, Petitioner and his family traveled from Germany to Fort Myers, Florida so his children could attend an international school and be exposed to and learn English.  (Marian Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 21:7-23:12.) In connection with those travels, Petitioner's children were issued student visas for 180 days during which time Petitioner traveled back and forth from Germany to the United States to tend to his job responsibilities and to be with his children.  (Id. at 21:7-23:12, 71:19-72:5.)   During this time, Petitioner and his family intended that they would return Germany after their children completed school.

While Petitioner was travelling back and forth from Germany to the United States in connection with his children's schooling, his employer decided to open a new subsidiary in the

---

[2] Petitioner's deposition testimony is properly admissible pursuant to Federal Rule of Civil Procedure 32(a)(4)(B) because he resides more than 100 miles from the Court and has not, by virtue of his residence, procured his own absence.  See Tyson Foods, Inc., 255 F.R.D. 560, 561 (N.D. Ala. 2009) (holding that the secretary of labor could not be said to have "procured" the absence of employees or former employees who resided and worked in areas that were hundreds of miles from the courthouse and their depositions were, therefore, admissible); Richmond v. Brooks, 227 F.2d 490, 492-493 (2nd Cir.1955) (plaintiff had not procured her absence merely because she resided in another state and had not attempted to be present at trial and her deposition testimony was therefore admissible); Bellamy v. Molitor, 108 F.R.D. 1, 2 (W.D. Ky. 1983) (deposition testimony allowed because "obviously, as the defendant has always resided more than one hundred miles from the place of trial, he did not procure his absence.").

United States.  (*Id.* at 23:13-24:18.)  Petitioner was tasked by his employer to run this subsidiary and, in connection therewith, signed an employment agreement that would keep him in the United States from March 1, 2010 through November 30, 2011.  (*Id.* at 68:9-71:18, 142:1-3 and Exhs. 7-9.)  After that time, Petitioner and his family intended that they would return home to Germany. (Marian Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 24:25-25:8.)

Consistent with the fact that Petitioner and his family intended to return to Germany, they told their children, before leaving Germany, that their trip to the United States would only be temporary.  (Marian Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 65:1-12.)  And, Respondent testified that no one – not even her parents – believed that her and her family's trip to the United States was intended to be permanent.  (Respondent's Dep. Tr. at 29:7-30:1, excerpts of which are attached as Exhibit "C.")

This is further supported by the statements Respondent made to the United States government in her visa applications.  In July 2009, when Respondent first applied to extend her visa to remain in the United States, Respondent informed the USCIS that "I am requesting that my stay be extended . . . to allow me to remain with and care for my young sons *until we return to Germany* at the end of the school year."  (*See* Letter to USCIS enclosing I-539 application for extension of Respondent's B-2 visa status, a copy of which is attached hereto as Exhibit "G") (emphasis added).  The same letter also mentions Petitioner's and Respondent's "vacation" home in which they were temporarily living while their children attended school.  (*Id.*)  Later, in February and November 2010, Respondent filed for two more visa extensions on behalf of herself and F.H.  Both applications requested permission to remain in the United States for a limited duration.  And the authorizations Respondent and F.H. received from the United States all stated that Respondent and F.H. were permitted to remain in the United States only on a

5

"temporary" basis subject to "nonimmigrant status." (*See e.g.*, Respondent's February 2010, November 2010, and  I-539 Applications and enclosed I-797A Notices of Action, copies of which are attached as Exhibits "H" and "I" respectively).   And, most recently, in 2012, Respondent applied for a student visa.  In support of that application, Respondent submitted a sworn affidavit in which she  stated that, upon completion of her college degree, she intends to return to Germany where she has a strong support circle made up of many friends and a large family. (*See* Affidavit of Stephanie Hamprecht dated January 3, 2012.)

Because Petitioner and Respondent intended to return to Germany with their family, they continued to maintain strong ties with Germany while in the United States.  While living in the United States, Petitioner and Respondent continued to: (1) possess valid German drivers' licenses and I.D.s; (2) pay taxes in Germany; (3) maintain a residence in Germany; (4) own vehicles in Germany; (5) maintain bank accounts in Germany; and (6) obtain various policies of insurance issued out of Germany for themselves and their children including life insurance, health insurance, liability insurance, car insurance (for vehicles maintained in Germany), third-party umbrella insurance, accident insurance for their children, including F.H., and pension insurance for Petitioner.  (Marian Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 27:12-28:16, 29:2-19, 76:8-79:24, 80:18-81:24, 83:7-93:13, 94:10-99:2 and Exhs. 2-4, 10-26; Respondent's Dep. Tr. at 12:10-14:10, 123:5-15.)  Petitioner's employer also maintained an apartment for Petitioner and his family in Berlin, Germany, and Respondent, herself, still owns land in Germany. (*Id.* at 15:25-16:9, 89:7-90:2.)   Additionally, F.H. remains registered for school in Germany because Petitioner and Respondent always intended that F.H. would return to Germany and be re-enrolled there. (Marian Hamprecht 4/19/2012 4:23 Dep. Tr. at 99:6-100:4, 102:5-25 and Exh. 27.)

6

The maintenance of these ties to Germany was intended to facilitate Petitioner's and Respondent's return to Germany where they and their children had a rich and happy life. That life is documented in photographs that Petitioner kept on his computer to remind him of home. (*Id.* at 33:9-44:17, 45:3-64:25 and Exh. 5.) These photographs show, among other things, that F.H. had many happy relationships with family and friends in Germany. (*Id.*) Those relationships remain strong even today. Just recently, one of F.H.'s young friends in Germany asked Petitioner about F.H. despite not having seen or talked to F.H. for quite a while. (*Id.* at 59:9-23.)

By contrast, all of the contacts Petitioner and his family had with the United States were temporary. When Petitioner and Respondent traveled to the United States, they only applied for and were issued temporary student and then work visas in connection with their stay. (Marian Hamprecht 4/19/2012 4:23 Dep. Tr. at 21:7-24:21, 75:2-8.) Additionally, while living in Florida they first stayed in a vacation home, which they later sold, and then lived only in rental properties. In fact, the lease for the rental property where Respondent and F.H. currently live is due to expire in July 2012. (Respondent's Dep. Tr. at 92:7-22.) However, Respondent has no plans for where she and F.H. will live next. (*Id.* at 92:23-93:3.)[3]

The only reason Respondent seeks to remain in the United States is that she was, and still is, having an extramarital affair with an American, Timothy Niles. (Marian Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 114:19-115:7, Respondent's Dep. Tr. at 42:4-11.) That affair began sometime around September 2011. But. it did not change Petitioner's or his children's intent to return to their home and their life in Germany. Thus, in mid-November 2011, just before Petitioner's job responsibilities in the United States concluded, Petitioner relinquished his

---

[3] Although the parties were in the process of drawing up plans for another vacation property, the parties never broke ground on that property to Petitioner's knowledge.

work visa and he and his two oldest sons returned to Germany.  (Hamprecht 4/19/2012 4:23 PM

Dep. Tr. at 25:16-20, 75:2-76:7, 141:23-25; *see also* Respondent's Answer at 8, ¶ 24 (admitting

Petitioner relinquished his visa in November 2011))  As previously briefed, this early departure

was because Petitioner's life was threatened in the United States and he feared for his safety as

well as for the safety of his two oldest sons who were living with him at the time. (*Id.* at 142:1-

146:4.)

Prior to Petitioner's return to Germany, Petitioner jointly exercised custody over F.H.

with Respondent.  Petitioner, as the sole wage earner, financially supported Respondent and all

of his children. (Respondent's Dep. Tr. at 63:14-20.)  Petitioner also provided emotional support

for his children and attended important events in their lives such as athletic competitions and

birthday parties to name just two.   (Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 140:3-13.)

Indeed, although Petitioner and Respondent were living separately and F.H. was living with

Respondent just before Petitioner returned to Germany, Petitioner remained active in F.H.'s life,

throwing him a sixth birthday party in October of 2011.  (Hamprecht 4/19/2012 4:23 PM Dep.

Tr. at 109:4-12; Respondent's Dep. Tr. at 67:14-72:5, 109:4-12.)  However, since returning to

Germany, Respondent has denied Petitioner all access to and information about F.H. and has

denied Petitioner his right to make joint custodial decisions regarding the care and welfare of

F.H. (Marian Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 31:15-32:23, 108:1-114:18 and Exhs.

34-39; Respondent's Dep. Tr. at 37:15-39:14.)  This is despite numerous requests by Petitioner

to have contact with his son, all of which have gone unanswered by Respondent.  (Marian

Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 31:15-32:23, 108:1-114:18 and Exhs. 34-39;

Respondent's Dep. Tr. at 40:21-42:1.)  For her part, Respondent provides no rational explanation

for why she has denied Petitioner access to his son.  According to Respondent, she alone has the

right "as a mother" to deny Petitioner the right to communicate with and make custodial decisions affecting F.H. (*Id.* at 39:12-14.) Accordingly, Petitioner has petitioned the German courts to have contact with and exercise custody rights over F.H. (Marian Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 103:16-107:25 and Exhs. 29-33.)

The evidence Petitioner will present at the May 4, 2012 final hearing will also show that F.H.'s home life in the United States lacks the type of stability that would make it his new habitual residence. For instance, other than Respondent, F.H. has *no* family in the United States. All of his relatives reside in Germany. (Marian Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 30:25-31:14**.**) That includes Petitioner, F.H.'s two older brothers, his maternal and paternal grandparents, and extended relatives. (*Id.*) These are important individuals to F.H. and F.H. has asked about them during the time Respondent has wrongfully retained him in the United States. (Respondent's Dep. Tr. at 59:9-62:15.) But, Respondent, without justification, refuses to permit F.H. to speak with any the relatives he asks about – not even Petitioner or F.H.'s two brothers, three of the most significant people in his life. (Marian Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 31:15-32:23, 108:1-114:18 and Exhs. 34-39; Respondent's Dep. Tr. at 37:15-39:14, 40:21-42:1.)

Additionally, F.H. does not have a settled address in the United States. He is forced to shuttle between the place he lives with Respondent and the home of Respondent's boyfriend, Mr. Niles. The evidence will show that Mr. Niles sleeps at Respondent's house and Respondent and F.H. sleep at Mr. Nile home. (Respondent's Dep. Tr. at 42:4-23, 43:9-44:1.) Respondent and Mr. Niles also take F.H. with them to various hotels where F.H. sleeps in the same room as Respondent and Mr. Niles – a man who is not F.H.'s father and who F.H. has known for only a short time. (*Id.* at 44:15-45:20.)

The stability of F.H.'s life in the United State is also undercut by the fact that Respondent has no job and no independent means of supporting F.H.  (Respondent's Dep. Tr. at 63:14-20.) Respondent's only source of income is a dwindling pool of marital assets that she absconded with before Petitioner returned to Germany.  (Marian Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 149:2-150:8.)  Those assets are being quickly depleted by Respondent's ordinary day-to-day spending activities and mounting legal bills, which include the services of three separate law firms.  When these funds run out, Respondent will have no funds left to support F.H., and it is unknown where Respondent and F.H. will stay after July 2012 when the lease for their current rental unit expires or how Respondent will pay for a new place to live or for F.H.'s care. (Respondent's Dep. Tr. at 92:7-93:3.)

Additionally, Respondent's and F.H.'s immigration status is uncertain.  The temporary visas that allowed Respondent and F.H. to remain in the United States pending the completion of Petitioner's job responsibilities expired when Petitioner relinquished his visa in mid-November 2011 and the term of his employment agreement expired at the end of November 2011.  Since that time, Respondent applied for a student visa.  (Respondent's Dep. Tr. at 23:6-7.)  However, that visa is also temporary and will remain valid for only so long as Respondent, who does not work and has no source of income, can continue to pay for and attend classes.  (*Id.* at 23:16-25.) Should that cease being the case, Respondent and F.H. may be subject to deportation.

Additionally, it appears that Respondent applied for a separate student visa for F.H.  (*See* Application to Extend-Change *Nonimmigrant* Status, a copy of which is attached as Exhibit "D.")  However, that visa has not yet issued.  (*See* Request for Evidence from the UCIS, a copy of which is attached as Exhibit "E.")  As a result, F.H.'s immigration status and his right to legally remain in the United States is in question.

Finally, as stated above, there should no longer be any dispute that F.H.'s place of habitual residence is Germany and that Petitioner and Respondent always intended that they and their children would return to Germany.  In the January 3, 2012 affidavit Respondent submitted to USCIS in connection with her application for a student visa, Respondent stated, under penalty of perjury, that:

> I have applied to and been accepted into the Early Childhood Education Associate's Degree Program at Edison Community College.  After termination of the program, *I plan on moving back to my residence in Germany, where I have a strong support circle made up of many friends and a large family and where I have strong financial standing.*
>
> \*        \*        \*
>
> I own property in Dorsten, Germany, *where I plan to return and seek employment* upon the termination of my program at Edison Community College.

(*See* Affidavit of Stephanie Hamprecht dated January 3, 2012.) (emphasis added).  Based on this, the other evidence set forth above, and the evidence that will be presented at the May 4, 2012 final hearing, the Court should enter an order requiring Respondent to return F.H. to Germany – his habitual place of residence.

## III.   DISCUSSION

"To address the harm done to children by international parental kidnaping, the Hague Convention is designed to restore the factual status quo and protect the legal rights of the non-abducting parent."  *Grijalva v. Escayola*, 2006 U.S. Dist. LEXIS 93532, at *2 (M.D. Fla. Dec. 28, 2006) (Steele, J.) (citing *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004)).  "The stated objectives of the Hague Convention are (1) to 'secure the prompt return of children wrongfully removed or retained in any Contracting State,' and (2) to 'ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting

11

States.'' *Id.* (citing *Furnes v. Reeves*, 362 F.3d 702, 710 (11th Cir. Mar. 10, 2004)).  "Thus, a court considering a petition for the return of a child under the Hague Convention and ICARA 'has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute. . . .  The Hague Convention is intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" *Id.* at *3 (quoting *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998)).

To establish that Respondent wrongfully retained F.H., Petitioner is required to prove that: (1) the habitual residence of F.H. immediately before the date of wrongful retention was Germany; (2) Respondent's retention of F.H. was in breach of Petitioner's custody rights under German law; and (3) Petitioner was exercising his custody rights at the time of the retention. *Ruiz v. Tenorio*, 392 F.3d 1247, 1251 (11th Cir. 2004) (citing Hague Convention, art. 3). Petitioner will establish each of these elements at the May 4, 2012 hearing.

## A.   F.H.'s Habitual Residence Is Germany

Habitual residence is not defined by the Hague Convention or ICARA.  However, courts "have defined 'habitual residence' as the place where the child has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Gatica v. Martinez*, 2010 U.S. Dist. LEXIS 143109, at *10 (S.D. Fla. Oct. 13, 2010) (quotation omitted).  Thus, "determination of a habitual residence focuses on the existence, or lack thereof, of a settled intention to abandon the former residence in favor of a new residence, coupled with an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized." *Ruiz v. Tenorio*, 392 F.3d 1247, 1253 (11th Cir. 2004), adopting the approach set forth in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001). "The inquiry into a child's habitual residence is a fact intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case."

*Boehm v. Boehm*, 2011 WL 863066, at *3 (M.D. Fla. March 10, 2011) (quoting *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006)).

"Any determination of 'habitual residence' must focus on the child and the parents' present, shared intentions regarding their child's presence there." *Gatica*, 2010 U.S. Dist. LEXIS 143109, at *10 (quotation omitted); *see also Ruiz*, 392 F. 3d at 1253 (one factor in determining habitual residence is the intent of the "person or persons entitled to fix the place of the child's residence."). Indeed, "[b]ecause the goal of the [Hague] Convention is to prevent one parent from unilaterally determining the country in which the child will live, the 'habitual residence' of the child cannot be shifted without mutual agreement. *In addition, courts have generally refused to find that the changed intentions of one parent shifted the child's 'habitual residence.*" *Gatica*, 2010 U.S. Dist. LEXIS 143109, at *10-11 (quotation omitted) (emphasis added).

"Relevant considerations bearing on the parties' intent include 'parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence.'" *Boehm*, 2011 WL 863066; *see also Maxwell v. Maxwell*, 588 F.3d 245, 252 (4th Cir. 2009) ("Federal courts have considered the following factors as evidence of parental intent: parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence."); *Riley v. Gooch*, 2010 U.S.

13

Dist. LEXIS 8173, at *28-29 (D. Or. Jan. 29, 2010) ("In determining whether a child has significant connections to the new country, the court considers a number of factors including: (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular activities; and (6) the respondent's employment and financial stability.")

These factors along with parental intent show that F.H.'s habitual residence is Germany. Most notably, the affidavit Respondent submitted in connection with her application for a student visa admits that her and F.H.'s time in the United States is only temporary and that they intend to return to Germany upon the conclusion of Respondent's degree program at Edison Community College. (*See* Affidavit of Stephanie Hamprecht dated January 3, 2012). Based on that admission, Respondent cannot maintain that she or anyone else in her family ever possessed the intent to permanently reside in the United States or that the United States is F.H.'s place of habitual residence.

Other objective evidence also supports a finding that F.H.'s habitual pace of residence is Germany. Petitioner, Respondent and their children are all German citizens. Before coming to the United States, they had a rich and fulfilling life in Germany – a life they intended to return to. All of their relatives reside in Germany and they had many good friends in Germany. *See* p. 7, *supra*. Indeed, one of the friends F.H. made in Germany still asks Petitioner about F.H. to this day. *See* pp. 7, *supra*. And as Respondent states in her affidavit, Germany is where she and F.H. have a "strong support circle made up of many friends and a large family." (*See* Affidavit of Stephanie Hamprecht dated January 3, 2012).

Petitioner, Respondent, and their children travelled to the United States in February 2009 for a temporary stay – first in connection with the education of Petitioner's and Respondent's children and then in connection with Petitioner's job responsibilities in the United States. *See* pp. 4-5, *supra*. They planned to return to Germany with their children once Petitioner's job responsibilities, which were contracted to run until November 30, 2011, concluded. *See* pp. 4-6, *supra*. Consistent with this, no one – not even Respondent's parents – believed that Respondent's trip to the United States was intended to be permanent. *See* p. 5, *supra*.

Intending to return to Germany, Petitioner, Respondent, and their children continued to maintain two residences in Germany while in the United States – one residence in Dresden was owned by Petitioner and Respondent, the other was rented by Petitioner's employer for his and his family's use and enjoyment. *See* p. 6, *supra*. Respondent herself continues to own property in Germany. Additionally, Petitioner and Respondent maintained drivers' licenses, automobiles, and bank accounts in Germany, and obtained various policies of insurance that issued out of Germany for themselves and their children while in the United States. *See* p. 6, *supra*.

In contrast, Petitioner's, Respondent's, and their children's lives in the United States lacked permanence. The owned a vacation home, but sold it. *See* p. 7, *supra*. After that, they lived only in rental properties. *See* p. 7, *supra*. In fact, the lease for their last rental property, where Respondent currently lives with F.H. is set to expire in July of this year. *See* p. 7, *supra*.

F.H.'s life in the United States also lacks the stability necessary to show that the United States has become his habitual residence. F.H. has no strong ties to the United States. Other than Respondent, all of F.H.'s relatives reside in Germany. *See* p. 9, *supra*. However, Respondent, since wrongfully retaining F.H. in the United States, refuses to permit F.H. to speak with any of his relatives – not even Petitioner, F.H.'s two brothers, or F.H's grandparents. *See*

pp. 8-9, *supra*.  Additionally, F.H. has no fixed address in the United States because he is forced to shuttle between two locations – one the location he lived in with Petitioner, Respondent, and his brothers, the other the home of Respondent's new boyfriend, Mr. Niles.  *See* p. 9, *supra*.

Another troubling fact undermining the stability of F.H.'s life in the United States is the fact that Respondent has no job and no independent means of supporting F.H.  *See* p. 10, *supra*. Respondent has never worked and her only source of income is a dwindling pool of marital assets that she absconded with from a joint marital account before Petitioner returned to Germany.  *See* p. 10, *supra*.  Those marital assets are being quickly depleted by Respondent's day-to-day spending – necessary for her and F.H.'s support – and mounting legal bills, which include the services of three separate law firms.   When these funds run out, Respondent will have no funds left to support F.H., and it is unknown where Respondent and F.H. will stay after July when the lease for their current residence expires or how Respondent will pay for a new living quarters or for F.H.'s care.

Additionally, Respondent's and F.H.'s immigration status is uncertain.  Respondent – contrary to her claim that she intended to permanently reside in the United States – has taken no steps to become a U.S. citizen.  And, the temporary visas that allowed Respondent and F.H. to remain in the United States pending the completion of Petitioner's job responsibilities, which were contracted to end on November 30, 2011, expired when Petitioner relinquished his visa in mid-November 2011 due to the threats made against his life.  Since that time, Respondent claims that she obtained a student visa.  *See* p. 10, *supra*.  However, that visa is also temporary and will remain valid only for as long as Respondent, who does not work and has no source of income, can continue to pay for and attend classes.  Should that cease to be the case, Respondent and F.H. may be subject to deportation.  Additionally, while it appears that Respondent separately applied

for a student visa for F.H., that visa has not issued and F.H.'s immigration status and legal right to remain in the United States is in question.  *See* p. 10, *supra*.  Thus, based upon the objective evidence, Germany – not the United States – is F.H.'s habitual residence.  *See In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1313-15 (S.D. Fla. 2004) (nine-year-old child was not settled in the United States even though she had lived in the United States for two-and-a-half years, consistently attended and performed  well in school, played soccer, and had friends, because she had changed residences five times and schools once, had only her mother and her aunt in the United States, could be deported, and was subject to her mother's uncertain immigration status and employment prospects); *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1282-83 (N.D. Ga. 2004) (ten-year-old child who had lived in the United States for two-and-a-half years was not well settled here despite regularly attending and performing well in school, participating in extracurricular activities, and having friends because, since arriving, she had moved three times, attended three different schools, had almost no family in the United States, and was here illegally); *Koc v. Koc*, 181 F. Supp. 2d 136, 146, 153-55  (E.D.N.Y. 2001) (finding that eight-year-old child was not settled in the United States because she had lived in three locations and attended three different schools in the two-and-a-half years she had been in the United States, did not regularly participate in extracurricular school or religious activities, did not socialize with school friends outside of class or have friends in the neighborhood, had many friends and  family back in Poland, and had uncertain immigration status and financial support, although she was doing well in school and saw some family in the area); *Casimiro v. Chavez*, 2006 U.S. Dist. LEXIS 76620 (N.D. Ga. Oct. 13, 2006) (finding child did not habitually reside in the United States because "[f]irst, and most importantly, the Court finds [the child's] uncertain immigration status very troubling.").

### B.    Respondent's Wrongful Retention Of F.H. In The United States Is A Breach of Petitioner's Custody Rights Over F.H.

Because F.H.'s habitual residence is Germany, the Court must determine whether Petitioner possessed custody rights over F.H. under German law at the time of his wrongful retention by Petitioner.  *Dallemagne*, 440 F. Supp. 2d 1283, 1295.  Under the Hague Convention, custody rights include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Hague Convention, Art. 5; *see also Whallon v. Lynn*, 230 F.3d 450 (1st Cir. 2000).

Under the Hague Convention, the Court "may take notice directly of the law of, and of judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable."  Hague Convention, Art. 14; *see also* FRCP 44.1.

Petitioner has rights of custody under German law pursuant to Section 1626 BGB (German Civil Code).  *See* Declaration of Daniela Kriedler-Pleus at ¶ 3 and Exh. 1, filed with the Court at Docket No. 41.[4]  Section 1626 BGB (German Civil Code) entrusts both parents with the

---

[4] Pursuant to Article 14 of the Hague Convention, the Court may properly consider this declaration as evidence of German law.  Indeed, the oft-cited Explanatory Report on the 1980 Hague Child Abduction Convention provides that "proof of the substantive law of the State of the child's habitual residence may be established by either certificates of affidavits, that is to say documents which include solemn statements for which those who make them assume responsibility."  Elisa Pérez-Vera, Explanatory Report on the 1980 Hague Child Abduction Convention at  ¶ 101 (HCCH Publications 1982), excerpts of which are attached as Exhibit "F." Such statements "may emanate from any qualified person – for example an attorney, solicitor, or barrister or research institution – as well as from the Central Authorities and the other competent authorities of the State of the child's habitual residence."  *Id.*; *see also Baker v. Booz*, 2008 U.S. 4th Cir. Briefs 1152 (4th Cir. June 23, 2008) ("The sworn declaration submitted by BAH, in addition to being unrebutted, contained sufficient detail to determine the substance of the Kyrgyz law that applies to these claims.") (citing *Lake Charles Cane Lacassine Mill, LLC v. SMAR International Corp.*, U.S. Dist. LEXIS 41941 (W.D. La. June 8, 2007) (unsworn affidavit sufficient); *Whallon*, 230 F.3d 450 (1st Cir. 2000) (affidavit of Mexican attorney explaining

welfare, care and education of their children.   *Id.* at ¶ 4.   Furthermore, Section 1631 BGB (German Civil Code) establishes that both parents must affirmatively consent to the child leaving the parental home.   *See* Declaration of Daniela Kriedler-Pleus at ¶ 5 and Exh. 2.   The retention of F.H. in the United States is therefore in violation of German law and is a wrongful retention within the meaning of Articles 3 and 5 of the Convention.   *Id.* at ¶ 6; *see also Sewald v. Reisinger,* 2008 U.S. Dist. LEXIS 115889 (M.D. Fla. Dec. 12, 2008) (finding that German parent possessed custody rights at time of wrongful removal because "under German law, the custody is mutual").   Put simply, Respondent has breached Petitioner's custody rights over F.H. by denying him the right to make *any* custodial decisions regarding the care and welfare of F.H and where F.H. should live and preventing Petitioner from having *any* contact with F.H.

## C.    Petitioner Was Exercising His Custody Rights Over F.H. At The Time F.H. Was Wrongfully Retained In The United States By Respondent

"While the Hague Convention does not define the 'exercise' of rights of custody, the Sixth Circuit has stated that '[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.'" *Grijalva*, 2006 U.S. Dist. LEXIS 93532, at *10 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. Ohio 1996)).   "[T]o 'hold that, if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those

---

parental rights under Mexican law was an acceptable form of proof); *Naghiu v. Intercontinental Hotels Group, Inc.*, 165 F.R.D. 413 (D. Del. 1996) (the court accepted the parties' proffer of opinion letters discussing Zairean law by individuals with expertise in the Zairean Civil Code); *Canadian Imperial Bk. of Commerce*, 899 F. Supp. at 1253 (stating that, "[s]pecifically, Plaintiff's motion papers include a declaration by an attorney admitted to the bar in Quebec as proof of the Quebec standard for in personam jurisdiction")).

custody rights under the Hague Convention short of acts that constitute *clear and unequivocal abandonment of the child.*'" *Id.* (quoting *Friedrich*, 78 F.3d at 1066).

Here it cannot be disputed that Petitioner was exercising his custody rights at the time of the retention.  Prior to Respondent's unlawful retention, Petitioner – the sole wage earner in his family – provided F.H. with financial and emotional support.  (Hamprecht 4/19/2012 4:23 PM Dep. Tr. at 140:3-13; Respondent's Dep. Tr. at 63:14-20.)  Petitioner also continued to have regular contact with F.H. prior to F.H.'s wrongful retention in the United States.  This is despite the fact that Petitioner and Respondent were separated at the time and F.H. was living with Respondent.  Specifically, just prior to returning to Germany, Petitioner threw F.H. a sixth birthday party with F.H.'s older brothers.   And, since returning to Germany, Petitioner has commenced legal proceedings in Germany to assert custody rights over his children, including F.H.  Accordingly, the Court should find that Petitioner was exercising custody rights at the time that Respondent wrongfully retained F.H. in the United States and order that F.H. be returned to Germany.  *See Leslie v. Noble*, 377 F. Supp. 2d 1232, 1243 (S.D. Fla. 2005) ("a liberal interpretation of the exercise of custody rights includes a parent's providing financial support and attempting to keep, or to seek, regular contact with a child.").

### D.      None Of The Exceptions To Ordering The Return Of A Wrongfully Retained Child Under The Hague Convention Are Applicable In This Case

"The general rule that a wrongfully removed or retained child must be returned has six exceptions which excuse the return of the child," none of which are applicable in this case. *Grijalva*, 2006 U.S. Dist. LEXIS 93532, at *5 (citing Hague Convention art. 12, 13, 20; *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1357-58 (M.D. Fla. 2002)).

> A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that: (1) the person having care of the child was not actually exercising the custody rights at the time of removal or retention, Hague

> Convention art. 13a; or (2) the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child, Hague Convention art. 13a; or (3) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention art. 13, unnumbered paragraph; or (4) the proceedings were commenced more than one year after the date of the wrongful removal or retention and "the child is now settled in its new environment.' Hague Convention art. 12. Additionally, a court is not bound to order the return of a child if respondent demonstrates by clear and convincing evidence that: (5) there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Hague Convention art. 13b; or (6) return of the child would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.

*Grijalva*, 2006 U.S. Dist. LEXIS 93532, at *5-7.   "[E]ach of the exceptions is to be applied narrowly."   *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1360 (M.D. Fla. 2002) (citing *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995) and 42 U.S.C. § 11601(a)(4)). Additionally, even if an exception is established, the Court has discretion to order the return of a child if return would further the aims of the Hague Convention. *Grijalva*, 2006 U.S. Dist. LEXIS 93532, at *7.

In this case, Respondent asserts that only one of these exceptions applies – that Petitioner purportedly consented to F.H. remaining in the United States.  (*See* Respondent's Answer at 9-12.)  In raising this exception, Respondent seeks to re-litigate the same argument put forth in her Motion to Dismiss – that Petitioner's allegations regarding "residence" in parallel state court proceedings constitutes an admission by Petitioner that he and Respondent intended to remain in Florida indefinitely and that Florida is F.H.'s habitual residence.  (Answer at p. 10 ¶¶ 18-19.) The Court already rejected this argument in its denial of Respondent's Motion to Dismiss and Respondent should not be heard to raise it again.  (*See* April 19, 2012 Opinion and Order, Docket No. 33.)  Indeed, this argument is contrary to every other piece of evidence showing that the

21

parties always intended to return to Germany and that Petitioner did not consent to F.H. remaining in Florida. It is also contradicted by the fact that Petitioner is doing everything in his power to assert his custody rights over F.H. and bring him home to Germany, including the filing of this case and parallel custody proceedings in Germany.

Respondent's Answer also argues that Petitioner somehow waived the right to have his custody rights over F.H. decided by German courts under German law because, prior to commencing this action, he filed for divorce and sought custody of F.H. in state court. (Answer at p. 11, ¶ 22.) That argument also fails. First, as Respondent concedes in her Answer, Petitioner withdrew his state court action and does not consent to the state court deciding custody issues related to F.H. (*Id.* ¶ 21.) The state court action only continues by virtue of Respondent's cross-petition for divorce. (*Id.*) Second, this Court recognizes that Federal Hague Convention proceedings take precedence over and are unaffected by parallel custody proceedings at the state court level. *Small v. Clark*, 2006 U.S. Dist. LEXIS 27638, at *3-6 (M.D. Fla. May 9, 2006) ("the Court concludes that abstention from the exercise of federal jurisdiction over these ICARA proceedings solely because there is an ongoing state court proceeding concerning the same parties, but not the parties' rights under the Convention, is not appropriate."). This is because cases brought under the Hague Convention are to determine which court is the *correct* court to decide custody issues. If the state court is not the proper court to decide such issues, then the state court must step aside. Consistent therewith, the state court action involving Petitioner and Respondent was stayed until the Court renders a decision in this action. Accordingly, Petitioner cannot be found to have consented to F.H. remaining in Florida, nor can he be found to have

DM1\3291275.5

waived his right to have a German court determine, under German law, how he and Respondent should exercise custody over F.H.[5]

### E.    The Court Should Order That F.H. Be Returned To Germany In The Company Of His Grandfather Who Has Travelled To The United States For This Proceeding

Because, Petitioner will establish, at the May 4, 2012 hearing, each of the elements required to secure the return of F.H. to Germany, Respondent should be ordered to turn F.H. over to the care of his paternal grandfather, Peter Hamprecht, within six hours after the Court concludes the May 4, 2012 hearing.  F.H.'s paternal grandfather and Petitioner's attorney Mark Scott will travel with F.H. on his trip back to Germany where F.H. will be returned to Petitioner's custody.[6]

---

[5] It makes no difference that the state court proceedings in this case were commenced by Petitioner rather than Respondent.  First, as noted above, Petitioner withdrew his divorce petition in the state court and does not consent to the state court deciding custody issues related to F.H. Second, the Ninth and First Circuits have both held that a petitioner does not relinquish his rights under the Hague Convention merely by consenting to a state court's jurisdiction in custody proceedings.  In *Holder v. Holder*, 305 F.3d 854, 873 (9th Cir. 2002), the Ninth Circuit held that the commencement of state court custody proceedings by a petitioner does not involve and, therefore, does not waive "the very thing that relief under the Hague Convention would give [a petitioner]: his choice of a . . . forum [in the child's place of habitual residence] to decide the custody issues under [the] law [of that forum], as contemplated by the Convention."  *Id.* Likewise, in *Nicolson v. Pappalardo*, 605 F.3d 100, 108 (1st Cir. 2010), the First Circuit held that a petitioner's agreement to the entry of a consent order granting respondent temporary custody over their child does not constitute a clear and unequivocal expression of consent by the petitioner to have custody issues regarding his child finally determined in state court rather than the courts of the child's habitual place of residence.

[6] Turning F.H. over to his paternal grandfather and Petitioner's attorneys is necessary given Petitioner's aversion to travelling to the United States due to the threats made against his life. Other Courts have granted similar relief.  For example, in *March v. Levine*, 136 F. Supp. 2d 831, 861 (M.D. Tenn. 2000) the court ordered the minor child at issue to be returned to Mexico in the care of either a family friend or lawyer.  *Id.*; *see also Nelson v. Petterle*, 782 F. Supp. 2d 1081, 1095 (E.D. Cal. 2011) ("Petitioner or her counsel shall proceed to place the child on the next reasonably available commercial flight to Reykjavik, Iceland. If Petitioner does not accompany child on the flight, Petitioner's counsel will make appropriate arrangements for child to travel as an unaccompanied minor.").  Clearly a grandparent has an even closer connection with a child

23

Petitioner further requests that Respondent be Ordered to remain in the presence of Petitioner's attorney, Mark Scott, until F.H. is turned over to the care of his paternal grandfather. This is to ensure that Respondent does not seek to abscond with F.H. prior to her obligation to turn F.H. over to his grandfather.  *See* 42 U.S.C. 11604 (the court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition").[7]

## IV.   <u>CONCLUSION</u>

For each of the foregoing reasons, Petitioner respectfully requests that the Court grant Petitioner the relief sought by his Verified Petition for Return and enter the proposed Order attached hereto as Exhibit "J."[8]

---

then a family friend or lawyer and the Court may order that F.H. be accompanied to Germany by his grandfather.

[7] Should the Court not immediately order the return of F.H. at the May 4, 2012 hearing Petitioner respectfully requests that F.H. and his travel documents be ordered to be turned over to Petitioner's attorneys who will accompany F.H. back to Germany should F.H.'s grandfather be required to return to Germany to care for his ailing wife.

[8] Petitioner also seeks to recover his attorneys' fees, costs, and other necessary expenses incurred in connection with this action pursuant to 42 U.S.C. § 11607.  In connection therewith and as requested in the proposed Order, attached hereto as Exhibit "J," Petitioner seeks leave to file a fee petition within 14 days of the entry of the Court's Order granting the relief requested in his Verified Petition for Return.  *See Gonzalez Locicero v. Nazor Lurashi*, 321 F. Supp. 2d 295, 298 (D.P.R. 2004) (requesting post-hearing briefing on attorneys' fees); *Knigge v. Corvese*, 2001 U.S. Dist. LEXIS 11199 (S.D.N.Y. Aug. 6, 2001) (same); *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1286 (N.D. Ga. 2004) (same).

**DUANE MORRIS LLP**

By:   /s/ Michelle Gervais
 **Michelle Gervais, Esq.**
 Florida Bar No.:  173827
 200 S. Biscayne Boulevard, Suite 3400
 Miami, Florida  33131
 Telephone:  (305) 960-2265
 Facsimile:   (305) 397-1868
 *Lead Trial Counsel*

 **Warren D. Zaffuto, Esq.**
 Florida Bar No.:  0743461
 Telephone:  (305) 960-2254
 Facsimile:   (305) 397-2536
 *Counsel for Petitioner*

DM1\3291275.5

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 3rd day of May, 2012, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send a notice of the electronic filing to counsel of record.

s/ Michelle Gervais_____
Michelle Gervais, Esq.

26