UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MARIAN HAMPRECHT,

                Petitioner,

vs.                              Case No.  2:12-cv-125-FtM-29DNF

STEPHANIE HAMPRECHT,

                Respondent.

_____

## OPINION AND ORDER

This matter comes before the Court on petitioner Marian Hamprecht's Verified Petition for Return of Child to Petitioner (Doc. #1) filed on March 5, 2012.  Respondent filed an Answer (Doc. #38) on April 16, 2012.  After ordering expedited pretrial proceedings, the Court conducted a bench trial on May 4 and 16, 2012.

The Verified Petition is filed pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670 1343 U.N.T.S. 97, reprinted in 51 Fed. Reg. 10,493 (Mar. 26, 1986) and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq. Petitioner Marian Hamprecht (petitioner or Marian) alleges that one of his three minor children is being unlawfully retained in the Middle District of Florida by his wife Stephanie Hamprecht (respondent or Stephanie), who has wrongfully prevented the child's return to his habitual residence of Germany.

Respondent counters that the habitual residence of herself and her son became Florida and, therefore, her admitted retention of the child in Florida is not wrongful under the Hague Convention. Respondent also asserts that petitioner has consented to the retention of the child in Florida.

**I.**

The general principles relating to the Hague Convention are well-settled. To address the harm done to children[1] by international parental kidnapping/retention, the Hague Convention is designed to restore the factual status quo and protect the legal rights of the non-abducting/retaining parent. The stated objectives of the Hague Convention are (1) to "secure the prompt return of children wrongfully removed to or retained in any Contracting State," and (2) to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Lops v. Lops, 140 F.3d 927, 935 (11th Cir. 1998)(quoting Hague Convention art. 1); see also United States v. Newman, 614 F.3d 1232, 1235-36 (11th Cir. 2010); Baran v. Beaty, 526 F.3d 1340, 1344 (11th Cir. 2008); Pielage v. McConnell, 516 F.3d 1282, 1286 (11th Cir. 2008). Thus, a court considering a petition for the return of a child under the Hague Convention and ICARA "has jurisdiction to decide the merits

---

[1]The Hague Convention effectively defines "children" as being under 16 years of age. When a child attains the age of 16 years, the Hague Convention ceases to apply. Hague Convention art. 4.

only of the wrongful removal [or retention] claim, not of any underlying custody dispute. . . .  The Hague Convention is intended to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'"  Lops, 140 F.3d at 936 (citations omitted)(quoting Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996)); see also Baran, 526 F.3d at 1344.

The Hague Convention mandates the return of children to their prior circumstances if one parent's removal or retention violated the custody rights of the other parent and was therefore "wrongful."  Hague Convention art. 12; 42 U.S.C. § 11601(a)(4). The removal or retention of a child is "wrongful" where it (1) violates the "rights of custody" of the non-abducting/non-retaining person "under the law of the State in which the child was habitually resident immediately before the removal or retention," and (2) the rights of custody were actually being exercised at the time of the removal or retention, or would have been exercised but for the removal or retention.  Hague Convention art. 3; Pielage, 516 F.3d at 1286-87; Lops, 140 F.3d at 935.  Therefore, a petitioner establishes the elements of wrongful removal or retention by demonstrating by a preponderance of the evidence[2] that: (1) the habitual residence of the child immediately before the date of the allegedly wrongful removal or retention was in the

_____

[2]42 U.S.C. § 11603(e)(1)(A); Pielage, 516 F.3d at 1286.

country to which return is sought; (2) the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (3) the petitioner was actually exercising or would have been exercising custody rights of the child at the time of his or her removal or retention. <u>Ruiz v. Tenorio</u>, 392 F.3d 1247, 1251 (11th Cir. 2004); <u>Lops</u>, 140 F.3d at 935-36. If petitioner meets this burden, the child who is wrongfully removed or retained must be promptly returned. <u>Lops</u>, 140 F.3d at 935-36 (citing 42 U.S.C. § 11601(a)(4)); <u>see also Abbott v. Abbott</u>, 130 S. Ct. 1983, 1989-90 (2010).

The general rule that a wrongfully removed or retained child must be returned is subject to six exceptions, each of which may excuse the return of the child. Hague Convention art. 12, 13, 20. A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence[3] that: (1) the person having care of the child was not actually exercising their custody rights at the time of removal or retention; (2) the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child; (3) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views"; or (4) the proceedings were commenced more than one year after the date of the wrongful removal or retention and "the child is now

---

[3] 42 U.S.C. § 11603(e)(2)(B).

settled in its new environment." Hague Convention art. 12, 13. Additionally, a court is not bound to order the return of a child if respondent demonstrates by clear and convincing evidence[4] that: (5) there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation"; or (6) return of the child would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. Hague Convention art. 13, 20. These "affirmative defenses" are narrowly construed to effectuate the purpose of the Hague Convention. See, e.g., Baran, 526 F.3d at 1345. Even if an exception is established, the Court has discretion to order the return of a child if return would further the aims of the Hague Convention. See Miller v. Miller, 240 F.3d 392, 402 (4th Cir. 2001); England v. England, 234 F.3d 268, 270-71 (5th Cir. 2000); Friedrich v. Friedrich, 78 F.3d at 1067; Feder v. Evans-Feder, 63 F.3d 217, 226 (3d Cir. 1995).

## II.

Based upon the evidence and testimony that the Court found to be credible, the Court makes the following findings of fact:

Petitioner and respondent (collectively "the parties" or "the parents") were both born in Germany, and have always been German citizens. They were married in Germany on December 16, 1994, and

---

[4]42 U.S.C. § 11603(e)(2)(A).

became the parents of sons born in 1995, 1997, and 2005 in Germany. The family resided in Germany until February 18, 2009, when they came to the United States. Prior to that time the family had often traveled to the United States, but no member of the family has ever attempted to obtain United States citizenship. The child at issue in this case is the youngest son, referred to as "F.H.", who was born in Germany on October 25, 2005. (Pet. Ex. 6.)

Petitioner was educated in Germany as an automobile technician and accountant. He worked for the family automotive supply business, took advanced studies, and became employed in the automotive industry. From 2001 through July 2005, petitioner worked at his own automotive consulting business, which developed projects for international markets. In July 2005, petitioner became the Chief Executive Officer (CEO) for Tube Technology Systems AG (TTS AG), a company founded in 2001 and located in Massen, Brandenburg, Germany. TTS AG currently manufactures and supplies specialized braking systems to Volkswagen, Audi, Lamborghini, and Bentley automobiles, and hopes to expand its customer base. Petitioner signed an employment agreement with TTS AG effective from July 2005 through July 31, 2007, and then an extension agreement effective through July 31, 2012. When petitioner became its CEO, TTS AG was near bankruptcy; petitioner reversed the decline during his tenure, and the company became profitable by at least 2009. (Res. Ex. 11.) Petitioner travels

extensively on his German passport and is well compensated. (Pet Ex. 2.)  Respondent has not been employed outside the home.

The parents wanted to immerse their oldest two sons in English, and decided to come to the United States for an extended stay.  The parties now disagree on the anticipated permanency of their stay in the United States, a matter which the Court will discuss in more detail later.  In sum, petitioner testified that the stay in the United States was to coincide with his temporary employment duties, and the family never intended to stay permanently.  Respondent testified that it had always been the plan and intent to move permanently to Florida.

In 2008, the parties sold their house in Germany, which was about 350 miles from the TTS AG plant, and moved to rental property in Dresden, Germany closer to the company.  On August 28, 2008, petitioner purchased a $739,000 waterfront home on Harbour Circle in Cape Coral, Florida.  (Pet. Ex. 67.)  The bulk of the purchase price was obtained from a wire transfer from Germany.  (Res. Ex. 5.)  Subsequent correspondence from respondent and her attorney refers to this house as the parties' "vacation home."  (Id.)

The parties also began making arrangements for their trip to the United States, checking on schools for the two older sons and checking on how to enter the United States.  On February 4 or 5, 2009, respondent and F.H. were issued six-month B-2 (visitor) visas at the U.S. Embassy in Berlin, Germany, while the other two boys

were issued F-1 (student) visas.  (Pet Ex. 48, 69; Res. Ex. 4.) Petitioner was admitted to the United States pursuant to the waiver program.  Petitioner, respondent, and their three sons arrived in the United States on February 18, 2009.

Upon their arrival in the United States, the family lived in the vacation home in Cape Coral and the two older boys enrolled in a private school in Fort Myers, Florida.  (Res. Ex. 13.) Petitioner would travel back and forth to Germany for his employment activities while his family remained in Florida.  TTS AG maintained an apartment for petitioner in Berlin, Germany.

Shortly thereafter, TTS AG decided to expand its production to the United States.  In March 2009, TTS AG incorporated Tube Technology Systems, Inc. (TTS Inc.) as a wholly owned Florida subsidiary.  TTS AG asked petitioner to run the United States affiliate in addition to his other duties with TTS AG.

Respondent's six-month visitor status was to expire on August 17, 2009.  In a letter dated July 12, 2009 to the United States Citizenship and Immigration Services (USCIS), respondent's attorney submitted an application for an extension of respondent's B-2 status.  (Pet. Ex. 67.)  Attached to the attorney's letter was an undated letter by respondent to the USCIS requesting the extension of her B-2 status.  (Id.)  Respondent's letter stated she was "requesting that my stay be extended until to allow me to remain with and care for my young sons until we return to Germany at the

-8-

end of the school year.  They are currently enrolled with valid F-2 student visas in a private program at Canterbury School in Fort Myers, Florida."  (Id.)  Both letters referred to an enclosure of a copy of a warranty deed to "our vacation home" in Florida.  (Id.) Respondent's "application for extension of temporary stay" was approved effective from August 18, 2009 through February 16, 2010. (Id.)

On November 18, 2009, TTS Inc. applied for a L-type visa for petitioner, which was granted on November 20, 2009.  (Res. Ex. 27.) A L-type visa is a nonimmigrant temporary visa to effectuate an intracompany transfer of an executive or manager to the United States.

In February 2010, petitioner formally agreed to establish and manage TTS Inc. for the manufacture of specialty automobile brake systems for United States automakers.  (Res. Ex. 11.)  On February 11, 2010, petitioner became the CEO of TTS Inc. pursuant to an additional employment contract with TTS AG and TTS Inc.  (Pet. Ex. 7; Res. Ex. 7, 8.)  This additional employment contract, which was governed by German law, was to terminate on November 30, 2011.  TTS AG officials variously estimated the project would take 18 to 24 months, and then petitioner was to return to Germany.

Because her visa extension would expire soon, in a February 10, 2010 letter by counsel, respondent applied for a change of her B-2 status to an L-2 status and an extension until January 31, 2011

to coincide with petitioner's L-1 status.  (Pet. Ex. 68.)  This application was approved on April 2, 2010, and respondent was given L-2 status (which was derivative of and dependent upon her husband's L-1 status) through January 31, 2011. (<u>Id.</u>; Res. Ex. 6.) A similar status change was granted for F.H. on May 5, 2010.  (Pet. Ex. 69; Res. Ex 6.)

Petitioner traveled back and forth to Germany, and researched a location in the United States for the new TTS Inc. plant.  While TTS Inc. had an address in Florida, the company decided to locate its first production facility in Auburn, Alabama.  The facility receives flat brake assemblies from Germany and bends them to fit the specifications of Volkswagens manufactured in Chattanooga, Tennessee.

The parties' two older sons re-enrolled in their private school for the 2010 school year.  (Res. Ex. 13.)  Petitioner's business activities were succeeding.  Petitioner and respondent, however, were having marital difficulties.  In a September 27, 2010, letter from a law firm in Germany, petitioner requested that they discuss pecuniary arrangements to secure respondent's and the children's financial future regardless of the future development of the parents' relationship.  (Pet. Ex. 58.)  No arrangements were formalized, and the parties temporarily reconciled thereafter.

To address their immigration statuses, both petitioner and respondent filed additional applications for extensions.  On

November 9, 2010, respondent applied for an extension of her L-2 status through January 30, 2013. (Pet. Ex. 70.) On November 17, 2010, TTS Inc. filed a petition with the USCIS for an extension of petitioner's L-1A status based upon his employment. (Res. Ex. 11.) TTS Inc. reported that petitioner had negotiated incentives with the City of Auburn, Alabama, hired a consultant to assist with preliminary work in setting up a production facility, shipped machinery and equipment required to begin operations, and reached an agreement with Volkswagen to supply its brake systems. (Id.) TTS Inc. stated that the dates of intended employment were January 31, 2011 to January 30, 2013. (Id.)

On December 16, 2010, both petitions were granted. Petitioner was issued an extension of the L-1 visa to stay in the United States through January 30, 2013, based upon his continued employment for TTS Inc. (Pet. Ex. 45; Res. Ex. 12.) Respondent was granted a "temporary stay" extending her stay in the United States through January 30, 2013. (Pet. Ex. 44.) This form notified respondent that her nonimmigrant status was based on the separate nonimmigrant status held by virtue of her husband's authorized employment in the United States. (Id.)

In February 2011, respondent signed contracts with the private school for all three of her sons for the 2011 school year. (Res. Ex. 13, 14.) By a letter dated March 16, 2011, respondent filed an application for permission to accept employment in the United

States.   This was approved on May 26, 2011.   (Pet. Ex. 71.)

In March 2011, the parties sold the vacation house in Cape Coral because it was too small for the family, and began planning to build a new house.   On March 15, 2011, respondent purchased a lot in the Gulf Harbor Yacht and Country Club, in Fort Myers, Florida, for $320,000 with funds wired from Germany.   (Res. Ex. 5.) Petitioner retained a real estate developer and former neighbor to design a custom residence with over 6,400 square feet of living space at an estimated cost of $1.25 million.   The design process would be completed, but was eventually cancelled due to the marital difficulties.   In March 2011, during an exchange of emails between petitioner in Germany and the designer, petitioner made reference to a "move to Fort Myers full time" and requested that the design process be expedited.   (Res. Ex. 15.)

Marital difficulties continued during the design process for the new house.   Respondent had opened up a bank account in her own name at a Florida bank in March 2011.   (Pet. Ex. 48.)   The parties separated in about August 2011.   In September 2011, petitioner discovered that respondent was having an on-going extramarital affair.   On September 26, 2011, respondent took in excess of $330,000 from a joint account with petitioner and deposited it in her sole account in the Florida bank.   (Pet. Ex. 59-61.)   By mid-October 2011, petitioner had physical custody of the two older boys

and respondent had physical custody of F.H.  Both parents, however, remained active in the care and upbringing of all three sons.

On October 13, 2011, respondent filed a domestic violence action against petitioner and obtained a state court temporary restraining order.  (Docs. #10, 11.)  On October 14, 2011, petitioner was arrested for violation of the restraining order. (Pet. Ex. 66.)  Respondent refused to fill out a sworn statement to the officer, and charges were never filed.  (Doc. #11.)

On October 20, 2011, petitioner filed for petition for divorce in the Lee County Circuit Court, stating that he and respondent "have been residents of the State of Florida for more than six months next before filing this petition." (Res. Ex. 20.)  Florida law requires that at least one of the parties to a divorce proceeding have been a Florida resident for more than six months. Fla. Stat. § 61.021.[5]  Petitioner dismissed the divorce petition on December 6, 2011.  Respondent, however, filed a cross-petition for divorce, which remains pending but is stayed by agreement of the parties.  (Docs. #10, 11.)

---

[5]Residency for a Florida divorce proceeding is a term of art. Petitioner would have had to prove an actual presence in Florida coupled with an intention at that time to make Florida the residence.  "[T]emporarily residing in Florida without a present intention to make Florida one's legal residence is not sufficient to establish Florida residency." Snyder v. McLeod, 971 So. 2d 166, 169 (Fla. 5th DCA 2007).  A person's nonimmigrant status does not bar the ability to establish residency, but may be a factor in determining a bona fide intent to remain in the state indefinitely. Weber v. Weber, 929 So. 2d 1165, 1168 (Fla. 2d DCA 2006).

-13-

On November 9, 2011, the state court entered an Order on Stipulation for No Contact directing petitioner to have no contact with respondent, and directing dismissal of the temporary injunction. (Res. Ex. 22.) On November 14, 2011, the temporary injunction was dismissed. (Pet. Ex. 72.)

Without informing respondent, on November 14, 2011, petitioner and the two older sons left Florida for Germany. Respondent had possession of the passports for all three sons. On November 15, 2011, petitioner and his two older sons went to the German embassy in Florida where they obtained emergency documents for the two older sons to return to Germany. They left for Germany later that day and arrived on November 16, 2011.

On or about November 17, 2011, both parents filed motions in the divorce proceeding asking for a temporary parenting plan. Petitioner and respondent both asked for custody of all three children. On December 7, 2011, the state court entered an order granting temporary custody of all three children to the mother and directing that the two older children be returned to Florida. (Res. Ex. 23, 24; Docs. #10, 11.)

Petitioner resumed working in Germany for TTS AG. Raik Gleitsmann, chairman of the board of TTS AG, testified that he had no information about petitioner's personal life, but does oversee petitioner's work. Gleitsmann testified that in November 2011 petitioner had to return to Germany for work because another

manager had retired in October 2011, and petitioner was the only manager left.  TTS AG did not request petitioner to stay longer in the United States.  On November 21, 2011, TTS Inc. withdrew its November 18, 2009, petition for nonimmigrant worker status for petitioner.  The USCIS revoked the petition effective that date. (Res. Ex. 27.)

The last time respondent attempted to contact her two sons in Germany, or to speak with them when they attempted to contact her, was in the end of November 2011.  Petitioner has tried to contact respondent and F.H. repeatedly by email, but respondent has never returned the contact or allowed F.H. to do so.  Additionally, respondent has not let F.H. contact his father or paternal grandparents since that time.

On January 3, 2012, petitioner filed an Application for Regulation of Parental Custody in a German court regarding his three sons.  Petitioner sought full parental custody, or alternatively, the right to determine the place of residence of his three sons.  (Pet. Ex. 30, 31.)  On January 19, 2012, the German court appointed a guardian ad litem for all three sons.  (Pet. Ex. 32, 33.)

Respondent's immigration status in the United States was derivative of petitioner's status, which was dependent upon his employment in the United States. Respondent therefore applied for and was accepted as a student at Edison State College for classes

beginning January 12, 2012.  (Pet. Ex. 48; Res. Ex. 25.)  By a
January 10, 2012, letter authored by counsel, respondent filed an
application with the USCIS for an extension/change of nonimmigrant
status.  (Id.)  Respondent's January 3, 2012 application requested
an F-1 (student) status, independent of any application or status
of petitioner, stating that she traveled on a German passport and
was not an applicant for an immigrant visa.  (Id.)  Respondent's
signed Certificate of Eligibility for Nonimmigrant (F-1) Student
Status stated she had been accepted at Edison State College for
classes majoring in Early Childhood Education and Teaching, which
she expected to complete "not later than 05/05/2014."  (Id.)
Respondent certified that "I seek to enter or remain in the United
States temporarily, and solely for the purpose of pursuing a full
course of study at the school. . . ."  (Id.; Pet. Ex. 51.)  In a
separate Affidavit of Stephanie Hamprecht dated January 3, 2012,
respondent stated that she was currently present in the United
States pursuant to a grant of Change of Status to L-2 status as a
dependent spouse "during my husband's temporary work assignment"
valid from February 1, 2011 to January 30, 2013; that her husband
had filed for divorce; that while divorce proceedings are pending,
and after the termination of the marriage, she "wish[ed] to stay in
the United States to pursue a degree in Early Child Education in
order to better my chances of employment in Germany"; that she was
not employed during her 17 year marriage, and therefore "I will

have difficulty finding employment upon my return to Germany
without any kind of formal education"; that after completion of her
program at Edison Community College "I plan on moving back to my
residence in Germany, where I have a strong support circle made up
of many friends and a large family and where I have a strong
financial standing"; and that "I own property in Dorsten, Germany,
where I plan to return and seek employment upon the termination of
my program at Edison Community College." (Res Ex. 25; Pet. Ex. 48,
52.)

On February 24, 2012, the requested change of status to F-1
(student) was granted for respondent. (Pet. Ex. 49, 50.) The
approved "temporary stay" was valid for the duration of
respondent's student status. (Id.)

In a March 7, 2012 letter by counsel, respondent caused an
application to be filed on behalf of F.H. requesting a change of
status to F-2 status. (Pet. Ex. 49.) The application stated that
F.H. was "supported by my mother, based on whose principal status
I am applying." (Id.) The application remains pending as the
USCIS issued a Request for Evidence on May 1, 2012 requiring a
Dependant Copy of the SEVIS Form I-20 by June 3, 2012. (Pet. Ex.
75.)

In an April 5, 2012, answer to request for admission,
respondent stated: "Respondent denies that she ever intended to

return to Germany after moving to the United States." (Pet. Ex. 56.)

**III.**

**A.  Petitioner's Case:**

The threshold issues of any Hague Convention case are undisputed in this case.  The parties agree that F.H. is a child under 16 years of age; that Germany and the United States both became signatories to the Hague Convention prior to the events at issue in this case; and that the Hague Convention applies to F.H.

Petitioner asserts that his youngest son is being wrongfully retained in the United States by respondent.  To establish his case for wrongful retention, petitioner must prove by a preponderance of the evidence that (1) the child's habitual residence was Germany at the time respondent refused to allow the child's return to Germany; (2) respondent's conduct constituted a "retention" of the child within the meaning of the Hague Convention; (3) the retention of the child was in breach of petitioner's custody rights under the laws of Germany; and (4) petitioner had been exercising those custody rights at the time of the retention.  See, e.g., Pielage, 516 F.3d at 1286-87; Ruiz, 392 F.3d at 1251.

**(1) Habitual Residence of the Child:**

Petitioner must establish that F.H.'s habitual residence was Germany at the time respondent refused to allow the child's return to Germany.  Hague Convention art. 3.  The Court must first

-18-

determine when the alleged wrongful retention took place, because the only point in time when habitual residence is relevant under the Hague Convention is immediately before the retention. Barzilay v. Barzilay, 600 F.3d 912, 918 (8th Cir. 2010).

The retention of F.H. in the United States was clearly with the petitioner's consent until November 14, 2011, the date petitioner left for Germany with his two other sons. The first record evidence of petitioner withdrawing his consent is November 17, 2011, when he filed an amended motion for a temporary parenting plan in the state circuit court requesting custody of F.H. as well as the other two children. From at least that point forward, the parents each sought custody of F.H. In any event, a precise date is unnecessary because "there was no significant change in the [child's] living arrangement[] during that period of time." Barzilay, 600 F.3d at 918. The Court finds that respondent retained F.H. in the United States without the consent of petitioner from on or about November 17, 2011 through the present. The issue therefore becomes the location of F.H.'s habitual residence as of that time period.

Neither the Hague Convention nor ICARA define habitual residence. Rather than a definition, the Eleventh Circuit has adopted an approach to determine habitual residence. Determination of a habitual residence focuses on the existence or non-existence of a settled intention to abandon the former residence in favor of

a new residence, coupled with an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized.  <u>Ruiz</u>, 392 F.3d at 1253-54, adopting the approach set forth in <u>Mozes v. Mozes</u>, 239 F.3d 1067 (9th Cir. 2001).  The Court concludes that petitioner has established by a preponderance of the evidence that F.H.'s habitual residence remained Germany.

The Court finds that the parents never had a shared intention to abandon Germany as a habitual residence and to make the United States the habitual residence for themselves or F.H.  Both parents clearly had the shared intent to come to the United States for some period of time, but now disagree as to the permanency of the move. At the least, there was an agreement to stay for the duration of petitioner's employment activities in the United States. Petitioner maintains this was the extent of the agreement, while respondent asserts that it was agreed they would never again reside in Germany.

The Court does not find respondent's testimony regarding their agreement to remain permanently in the United States to be credible.   Respondent has shown a propensity to make whatever statement is in her best interest at the time in this regard. Petitioner testified before the Court that since February 18, 2009, it has been her intent to live permanently in Florida; that this intent has never changed; and that since her arrival in the United States she never intended to return to Germany.  In an April 5,

2012, answer to requests for admissions, respondent denied "that she **ever** intended to return to German after moving to the United States." (Pet. Ex. 56, p. 4; emphasis added.)  And yet, in July 2009, respondent told the USCIS that she was requesting a visa extension to stay with her children "until we return to Germany at the end of the school year." (Pet. Ex. 67.)  In January 2012, respondent told the USCIS she was requesting a student visa to complete her education so as to "better my chances for employment in Germany." (Res Ex. 25; Pet. Ex. 48, 52.)  More specifically, respondent stated in this application that "I plan on moving back to my residence in Germany, where I have a strong support circle . . . and where I have a strong financial standing."  (Id.) Respondent said she owned property in Dorsten, Germany, "where I plan to return and seek employment upon the termination of my program" at school.  (Id.)  The Court finds that the parents never had the settled intention of abandoning Germany as their habitual residence in favor of the United States.

The relevant objective facts are sufficient to support petitioner's burden of establishing habitual residence in Germany for F.H. by a preponderance of the evidence.  It is true, of course, that the parties and their children relocated to the United States; resided initially in a house they had previously purchased; sold that house and planned to build a larger one; acquired property in the United States, including real property, vehicles,

and several boats; placed their children in school; and led a comfortable lifestyle consistent with their financial status. The parties also continued to maintain many ties to Germany. Petitioner maintained a German driver's license, German identification, and a German pension; the family paid for and maintained German health insurance and liability insurance; the children were covered by German insurance; the parties maintained German bank accounts; respondent owned a real property lot in Germany; and all their family members were in Germany. The parent's and children's immigration status in the United States was always temporary. These actions are largely consistent with an extended temporary stay and establishment of a vacation home.

Respondent's current student status is also problematic because the statute requires such a student to have no intention of abandoning her residence in a foreign country and to be in the United States temporarily and for the sole purpose of pursuing the course of study. 8 U.S.C. § 1101(a)(15)(F)(i). F.H.'s current status is derivative of his mother's.

Consequently, the Court finds that at the time of the retention, the habitual residence of F.H. was Germany.

**(2) "Retention" of the Child:**

Plaintiff must also establish there has been a "retention" within the meaning of the Hague Convention. <u>Pielage</u>, 516 F.3d at 1287. "Retention" within the meaning of the Hague Convention "is

-22-

meant to cover the circumstances where a child has been prevented from returning to his usual family and social environment." Pielage, 516 F.3d at 1288.  It is undisputed that respondent has maintained custody of F.H. in the United States, and has refused to allow petitioner to communicate with F.H. and refused to allow F.H. to communicate with petitioner.  Respondent retains F.H.'s German passport (until surrendered to the court), has declined to return F.H. to Germany, and indeed has initiated legal proceedings to prevent that from occurring.  The Court finds that there was a "retention" of F.H. within the meaning of the Hague Convention from at least November 17, 2012 forward.

   **(3) "Wrongful" Retention of the Child:**

   The Court must next determine whether that retention was wrongful.  Pielage, 516 F.3d at 1287.  Not every retention is wrongful; retention is wrongful under the Hague Convention only where it is in breach of rights of custody attributed to the non-retaining party.  Id. at 1288.  Under German law, as set forth in Pet. Ex. 43, both parents have a right to parental custody of a minor child, which includes the right and duty to care for the person of a minor child.  The care of the person of a minor child includes the right and duty "to care for, bring up and supervise the child and to specify its abode."  (Pet. Ex. 43.)  The best interests of a minor child includes, as a general rule, contact with both parents.  Both parents must affirmatively consent to the

child leaving the parental home.  (Id.)  Additionally, the Hague Convention specifically provides that "rights of custody" include "the right to determine the child's place of residence."  Hague Convention art. 5.  Further, one parent may not unilaterally determine the country in which the child will live; this means that "the habitual residence of the child cannot be shifted without mutual agreement."  Mikovic v. Mikovic, 541 F. Supp. 2d 1264, 1275 (M.D. Fla. 2007) (quoting Cabrera v. Lozano (In re Cabrera), 323 F. Supp. 2d 1303, 1311 (S.D. Fla. 2004)).  Returning a child to his or her habitual residence, however, does not require the consent of both parents since the very purpose of the Hague Convention is to "restore the pre-abduction [or retention] status quo," Lops, 140 F.3d at 936 (internal quotations omitted), "and to establish procedures to ensure [the child's] prompt return to the State of [his] habitual residence," Baran, 526 F.3d at 1344 (internal quotations omitted).

The Court concludes that the evidence in this case establishes that respondent's retention of the child was a wrongful retention under the Hague Convention.  Respondent's refusal to allow communication between F.H. and petitioner, and her unilateral retention of F.H. without the consent of petitioner, violate petitioner's custody rights under German law.

### (4) Petitioner's Exercise of Custody Rights:

While the Hague Convention does not define the "exercise" of rights of custody, the Sixth Circuit has stated that "[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." Friedrich, 78 F.3d at 1065.  The court went on to "hold that, if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child."  Id. at 1066.  See also Pesin v. Osorio Rodriguez, 77 F. Supp. 2d 1277, 1286-87 (S.D. Fla. 1999).

Under this standard, Petitioner has established he was exercising his rights of custody at the time the child was wrongfully retained.  Petitioner continued to see and visit with the child and participate in his life prior to leaving for Germany. After November 14, 2011, petitioner has made multiple efforts to maintain contact with the child as well as to obtain custody of F.H.

**B. Respondent's Asserted Exception**

A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that the person having care of the child had consented to, or acquiesced in, the removal or retention of the child.  Hague Convention art. 13a; 42 U.S.C. § 11603(e)(2)(B).  Respondent asserts that return of the child is not required because petitioner consented to and/or acquiesced in the retention of the child.  Both of these defenses are narrow.  "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention."  Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005).

Respondent argues that petitioner consented to F.H. remaining indefinitely in Florida, and largely re-argues the habitual residence argument.  The Court finds that there is no credible evidence to support a finding that petitioner consented to F.H. remaining indefinitely in Florida or acquiesced in such a situation.  Petitioner's actions after November 14, 2011, including his active pursuit of custody in a German court and this petition, point to a lack of consent and acquiescence on petitioner's part.  Therefore, respondent's affirmative defense has not been established.

Accordingly, it is now

**ORDERED**:

1.   The Verified Petition for Return of Child to Petitioner (Doc. #1) is **GRANTED**.

2.   Respondent shall surrender custody of the minor child, F.H., to petitioner's father, Peter Hamprecht, on or before May 29, 2012, for return to Germany.   Counsel for petitioner shall coordinate arrangements with counsel for respondent.

3.   F.H. shall be returned to Germany at petitioner's expense. Respondent may accompany Peter Hamprecht and F.H. to Germany if she chooses, at her own expense.

4.   The Clerk of the Court is directed to release F.H.'s passport to counsel for petitioner or to Peter Hamprecht so that F.H. may travel to Germany.   The Clerk is further directed to enter judgment accordingly and close the case.

**DONE AND ORDERED** at Fort Myers, Florida, this 24th day of May, 2012.

JOHN E. STEELE
United States District Judge

Copies:
Counsel of record